IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

JAY W. ISBELL,                                    :
      Plaintiff,                                :
                                :
                                :
vs.                                               :          CIVIL ACTION 17-0021-JB-MU
                                :
DR. ARNOLD, *et al*.                              :
      Defendants.                               :
                                :

## <u>REPORT AND RECOMMENDATION</u>

Plaintiff Jay W. Isbell, an Alabama prison inmate proceeding *pro se* and *in forma pauperis*, filed his complaint under 42 U.S.C. §§ 1983. (Doc. 1). This action was referred to the undersigned pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72(a)(2)(R) and is now before the undersigned on Defendants' Motion for Summary Judgment.  (Doc. 75). After careful review of the pleadings, and for the reasons set out below, it is **RECOMMENDED** that Defendants' Motion for Summary Judgment be **GRANTED** in favor of Defendants and that the claims asserted against Defendants Arnold, Kouns, Barber, Joiner, C. Johnson and McCants, be **DISMISSED** with prejudice.

**I.**     **Summary of Allegations.**

Plaintiff alleges in his complaint that, while in the custody of the Alabama Department of Corrections, he has been denied or delayed adequate medical treatment (relating to his Hepatitis C condition and gallbladder issues) in violation of the Eighth Amendment.

According to Plaintiff, for over 19 years, he has suffered with Hepatitis-C but has never received treatment for the condition, despite "always complaining" about it to the

doctors and nurses at Holman Correctional Facility. (Doc. 1 at 9; Doc. 27).  Plaintiff alleges that, on or about April 22, 2015, he submitted his first sick call request for stomach pain, nausea, and swelling in the upper right quadrant of his abdomen. He claims he was examined on April 28, 2016 by Dr. Kouns, who informed Plaintiff (based on the results of an ultrasound) that his liver was "slightly enlarged". (Doc. 1 at 9). Dr. Koun's further informed Plaintiff "that he knew for sure that I was on the Treatment List for Hep.-C treatment." (Doc. 1 at 9).  However, Nurse Johnson told Plaintiff (in response to a filed medical complaint) that he was not a candidate for Hepatitis C treatment but that his condition would be monitored through the Chronic Care Clinic.  (Doc. 1 at 16).  Plaintiff claims that, despite multiple inquiries over nearly a year and a half, he was never advised by the defendants of the eligibility requirements for receiving Hepatitis C Virus ("HCV") treatment, although he was consistently told "sorry you'r[e] having problems but you don't meet criteria to be treated," nor were his symptoms of upper right abdominal pain treated. (Id.; Doc. 27).  Plaintiff specifically challenges that 20 questions regarding HCV and candidacy eligibility for HCV treatment (listed on a self-prepared "questionnaire") were never answered by the medical defendants, namely Dr. Arnold; although, Plaintiff admits that Dr. Arnold did "try to answer some of the questions" and explained that two of the tests listed on Plaintiff's questionnaire were used in diagnosing progression of HCV and candidacy for treatment.  (Doc. 1 at 10).

Plaintiff further claims that in December 2016, he was informed by Dr. Arnold (following an ultrasound scan) that his gallbladder was infected and enlarged and would necessitate surgical removal.  Dr. Arnold opined that Plaintiff's gallbladder "might be causing the pain" for which he had been experiencing and complaining of for a year and

a half. (Doc. 1 at 9). Plaintiff contends that had the doctors provided him proper medical treatment, rather than delaying the same, his gallbladder would not have become enlarged or infected. (Doc. 27).

In support of his claim, Plaintiff submits the following sick call requests and medical grievances:

On April 22, 2015, Plaintiff submitted a sick call request to receive the new HCV pill, Harvoni, to treat the Hep. C he had suffered with for 17 years, including symptoms of "staying sick on [his] stomach, and swelling." (Doc. 1 at 14).

On June 2, 2015, Plaintiff submitted a medical grievance reiterating his request for the new medication, Harvoni, to combat his symptoms of cramps, swelling, and nausea. Plaintiff asserts he has "had Hep C for over 14 years and need[s] it to be treated." (Doc. 1 at 15).[1]

On July 22, 2015, Plaintiff complained that his requests for Harvoni had been denied by Corizon (on 4/22/15, 6/2/15, 6/5/15). (Doc. 1 at 17). Plaintiff asked to be informed of the criteria he would need to meet to be a candidate for the medication and an appointment with a liver specialist for a second opinion regarding his enlarged liver, as well as a biopsy.

On July 31, 2016, Plaintiff submitted a medical grievance challenging his denial of HCV treatment with Harvoni on April 22, 2015. He claims he is suffering from pain, swelling, and other symptoms from the disease. He complains that he has suffered from the "deadly" disease for 17 years and is hurting, cramping, and suffering each day, and despite there being a "cure," he is told he is ineligible for the treatment, but questions what the criteria is to be eligible. He further requests a second opinion by a specialist. (Doc. 1 at 17).[2]

_____

[1]     Nurse Johnson responded to Plaintiff's grievance and informed him that he was not currently a candidate for treatment at that time. She noted that he was being followed through the chronic care clinic and that the doctor was monitoring his liver. Nurse Johnson encouraged Plaintiff to discuss his treatment with the doctor at his next chronic care visit. (Doc. 1 at 16).

[2]     Nurse Johnson responded to Plaintiff's grievance and apologized that he was having problems but restated that Plaintiff did not meet the criteria for treatment. She informed him that the doctor and disease specialist, Dr. Joiner, made the decisions regarding receipt of treatment. Nurse Johnson scheduled Plaintiff an appointment with the doctor so that the "criteria and requirements for treatment" could be discussed with him. Nurse Johnson further encouraged Plaintiff to keep all his chronic care appointments so that his blood levels may be checked and monitored for evaluation of eligibility and need for treatment. (Doc. 1 at 18).

On September 8, 2016, Plaintiff submitted a sick call request reiterating the same requests.  (Doc. 1 at 19).

On September 13, 2016, he submitted a medical complaint regarding the denied requests.  (Doc. 1 at 20).

On September 14, 2016, he filed a formal grievance, which included the complaints and requests.  (Doc. 1 at 21).[3]

On November 14, 2016, Plaintiff filed a written complaint to Nurse McCants for the delay in obtaining the results of previous blood and urine tests.  He further requested to be referred to a liver specialist. (Doc. 1 at 22).

On November 26, 2016, Plaintiff submitted a formal grievance that included 20 questions to be answered by the medical personnel concerning the criteria used by Corizon to determine his eligibility for treatment and other questions related to his condition, test results, and treatment plan.[4]  (Doc. 1 at 23-28).  On December 4 and 12, 2016, Plaintiff complained that these questions had yet to be answered.[5]  (Doc. 1 at 29-30).

Plaintiff is suing Dr. Arnold, Dr. Kouns, Dr. Barber, and Dr. Joiner for delay in

diagnosing and treating his medical condition.[6]  (Doc. 1 at 5).  Plaintiff is suing Nurse

---

[3]     Defendant McCants responded to Plaintiff's grievance informing him that the doctor makes all of the medical decisions at Holman and that Plaintiff could discuss the matter with the doctor at his appointment that was scheduled later that month.  Defendant McCants also stated she would speak with the chronic care nurse to see if he qualified for treatment.  (Doc. 1 at 21).

[4]     Defendant McCants responded to the grievance that Plaintiff was "seen by the doctor today and hopefully your issues and questions were resolved or answered...." (Doc. 1 at 23).

[5]     Defendant McCants responded to both grievances that Plaintiff was brought to the infirmary on 11/30/16 and Dr. Arnold discussed the grievance with him.  (Doc. 1 at 29-30).

[6]     Paragraph D on page 1 of the § 1983 Prisoner Complaint form, which inmates are required to use to present a § 1983 claim to the Court in the Southern District and which Plaintiff used here, states that "[t]he persons who are listed as defendants in section III of the complaint are deemed by the Court to be the only defendants to this action."  In section III of his complaint, Plaintiff listed Dr. Arnold, Dr. Koons, Dr. Barber, Dr. Joiner, Nurse Johnson, and Nurse McCants as defendants in his action; therefore, they are deemed by the Court to be the only defendants in this action. Because Dr. Stone was only listed in the style of the complaint and was not listed in section III, he is not a party to this action.

Johnson and Nurse McCants for failure to answer his questions regarding HCV symptoms and treatment.[7]  (Doc. 1 at 12).

Plaintiff requests that he be awarded:

1.  Immediate treatment for his symptoms;

2.  Immediate treatment or surgery to remove gallbladder "if applicable";

3.  Immediate placement in the HCV treatment program;

4.  Answers to all questions asked in the questionnaire submitted in his medical grievance;

5.  Copy of ADOC's Criteria for placement into the HCV treatment program;

6.  Copy of Corizon's Policy and Procedure Manual for Medical Care of inmates under its "Full Risk" Contract with ALDOC;

7.  Copy of Corizon's Provider Info. Manual;

8.  Copy of "Clinical Practice Guidelines for the prevention and treatment of viral hepatitis; and

9.  Compensatory and Punitive damages of $50,000.00.

(Id. at 8).  Defendants have answered the suit, denying the allegations against them, and submitted special reports in support of their positions.  (Docs. 22, 24, 52, 60, 63, 67, 77, 78).  After a thorough review of the pleadings, including an affidavit from Plaintiff and his discovery requests, the Court converted Defendants' responses into a motion for summary judgment (see docs. 75, 79), and this motion is now ripe for consideration.

_____

[7]    Plaintiff asserts that the failure of the nursing staff to directly answer Plaintiff's medical questions illustrates "the Corizon policy to delay medical treatment to inmates with serious medical conditions in order to save money or in Corizon's contractual terms, 'the less treatment inmates re[c]eive the higher the profits realized by Corizon.'"  (Doc. 1 at 13).

## II.    Summary Judgment Standard.

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986); Garczynski v. Bradshaw, 573 F.3d 1158, 1165 (2009) ("[S]ummary judgment is appropriate even if 'some alleged factual dispute' between the parties remains, so long as there is 'no genuine issue of material fact.'" (emphasis omitted)).

The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex, 477 U.S. at 323.  The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing, or pointing out to, the district court that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof.  Id. at 322-24.

> Once the moving party has met its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324. To avoid summary judgment, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). On the other hand, the evidence of the nonmovant must be believed and all justifiable inferences must be drawn in its favor. *See Anderson*, 477 U.S. at 255.

ThyssenKrupp Steel USA, LLC v. United Forming, Inc., 926 F. Supp. 2d 1286, 1289-90 (S.D. Ala. Jan. 29, 2013) (citations omitted).

The requirement to view the facts in the nonmoving party's favor extends only to "genuine" disputes over material facts.  A genuine dispute requires more than "some metaphysical doubt as to material facts." Garczynski, 573 F.3d at 1165 (internal citations omitted).  A "mere scintilla" of evidence is insufficient; the nonmoving party must produce substantial evidence in order to defeat a motion for summary judgment. *Id*.  In addition, "[t]here is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment." Resolution Trust Corp. v. Dunmar Corp., 43 F.3d 587, 599 (11th Cir. 1995).  More importantly, where "opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." Scott v. Harris, 550 U.S. 372, 380, 127 S. Ct. 1769, 1776, 167 L. Ed. 2d 686 (2007); see also Logan v. Smith, 439 F. App'x 798, 800 (11th Cir. Aug. 29, 2011) ("In cases where opposing parties tell different versions of the same events, one of which is blatantly contradicted by the record—such that no reasonable jury could believe it—a court should not adopt the contradicted allegations." (citations omitted) (unpublished)).[8]

III.    **Discussion.**

The Eighth Amendment provides that, "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const.

---

[8] "Unpublished opinions are not considered binding precedent but may be cited as persuasive authority."  11th Cir. R. 36-2.

Amend. VIII. "The Eighth Amendment's proscription of cruel and unusual punishments prohibits prison officials from exhibiting deliberate indifference to prisoners' serious medical needs." Campbell v. Sikes, 169 F.3d 1353, 1363 (11th Cir. 1999) (citing Estelle v. Gamble, 429 U.S. 97, 104, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976)). In Sims v. Mashburn, 25 F.3d 980 (11th Cir. 1994), the Eleventh Circuit delineated the objective and subjective portions of an Eighth Amendment claim as follows:

> An Eighth Amendment claim is said to have two components, an objective component, which inquires whether the alleged wrongdoing was objectively harmful enough to establish a constitutional violation, and a subjective component, which inquires whether the officials acted with a sufficiently culpable state of mind.

Sims, 25 F.3d at 983 (citing Hudson v. McMillian, 503 U.S. 1, 8, 112 S. Ct. 995, 999, 117 L. Ed. 2d (1992)). To meet the objective element required to demonstrate a denial of medical care in violation of the Eighth Amendment, a plaintiff first must demonstrate the existence of an "objectively serious medical need." Farrow v. West, 320 F.3d 1235, 1243 (11th Cir. 2003). A serious medical need is "'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" Id. (quoting Hill v. Dekalb Reg'l Youth Det. Ctr., 40 F.3d 1176, 1187 (11th Cir. 1994), overruled in part on other grounds by Hope v. Pelzer, 536 U.S. 730, 739, 122 S. Ct. 2508, 153 L. Ed. 2d 666 n. 9 (2002)). "In either of these situations, the medical need must be one that, if left unattended, pos[es] a substantial risk of serious harm." Id. (internal quotation marks and citation omitted).

In order to meet the subjective requirement of an Eighth Amendment denial of medical care claim, Plaintiff must demonstrate "deliberate indifference" to a serious medical need. Farrow, 320 F.3d at 1243.

The Supreme Court clarified the "deliberate indifference" standard in *Farmer* by holding that a prison official cannot be found deliberately indifferent under the Eighth Amendment "unless the official *knows of* and *disregards an excessive risk to inmate health or safety;* the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837, 114 S. Ct. 1970 (emphasis added). In interpreting *Farmer* and *Estelle,* this Court explained in *McElligott* that "deliberate indifference has three components: (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than mere negligence." *McElligott,* 182 F.3d at 1255; *Taylor,* 221 F.3d at 1258 (stating that defendant must have subjective awareness of an "objectively serious need" and that his response must constitute "an objectively insufficient response to that need").

Id. at 1245-46. "Deliberate indifference" entails more than mere negligence. Estelle, 429 U.S. at 106; Farmer v. Brennan, 511 U.S. 825, 835, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994). "Conduct that is more than mere negligence includes: (1) grossly inadequate care; (2) a decision to take an easier but less efficacious course of treatment; and (3) medical care that is so cursory as to amount to no treatment at all." Bingham v. Thomas, 654 F.3d 1171, 1176 (11th Cir. 2011). In other words, "medical malpractice does not become a constitutional violation merely because the victim is a prisoner." Estelle, 429 U.S. at 104. Furthermore, deliberate indifference is not established when an inmate receives medical care, but "may have desired different modes of treatment." Hamm v. DeKalb Cty., 774 F.2d 1567, 1575 (11th Cir. 1985).

"Delay in access to medical attention can violate the Eighth Amendment . . . when it is tantamount to unnecessary and wanton infliction of pain." Hill, 40 F.3d at 1187 (internal citations and quotation marks omitted). "Cases stating a constitutional claim for immediate or emergency medical attention have concerned medical needs that are obvious even to a layperson because they involve life-threatening conditions or situations where it is apparent that delay would detrimentally exacerbate the medical problem." Id.

The "seriousness" of an inmate's medical needs also may be decided by reference to the *effect* of delay in treatment. Where the delay results in an inmate's suffering "a life-long handicap or permanent loss, the medical need is considered serious." An inmate who complains that delay in medical treatment rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment to succeed.  Further, we have held that "[t]he tolerable length of delay in providing medical attention depends on the *nature* of the medical need and the *reason* for the delay." Consequently, delay in medical treatment must be interpreted in the context of the seriousness of the medical need, deciding whether the delay worsened the medical condition, and considering the reason for delay.

Id. at 1188-89 (internal citations omitted) (footnotes omitted).

### 1.    Claims related to Plaintiff's Hepatitis C condition.

Plaintiff contends that all Defendants rendered inadequate medical care for his Hepatitis C condition and acted with deliberate indifference towards it by failing to treat the virus, namely by failing to prescribe him Harvoni (a medication he requested to cure his HCV).[9]  Defendants assert, and the record supports, that Plaintiff's Hepatitis C condition was consistently monitored through the chronic care clinic, that he was evaluated by the medical staff, that doctors were notified and consulted when necessary,

---

[9]    While Plaintiff alleges in his complaint that Dr. Kouns told him, based on the results of an ultrasound, that his liver was "slightly enlarged" and that he was "for sure . . on the Treatment List for Hep.-C treatment" (doc. 1 at 9), the Court cannot stand on the veracity of this statement, as it is completely belied by the record. Indeed, the record refutes that any abdominal ultrasound (other than the one conducted on December 15, 2016) was ever ordered or performed.  First, there is no ultrasound report in Plaintiff's medical records.  Second, there are no orders or plans indicated to obtain an ultrasound prior to December 2016.  Third, Plaintiff has alleged no facts beyond his conclusory allegation that such an ultrasound was performed (like when it was conducted, who ordered the scan, or where it was conducted).  And fourth, Plaintiff's statements to Dr. Arnold during his August 16, 2016 exam corroborates that no such ultrasound exists. Review of the record reveals that on August 16, 2016, Plaintiff was seen by Dr. Arnold to discuss his qualifications for Hepatitis C treatment.  (Doc. 67-3 at 110). The chart notations indicate that, at that time, Plaintiff stated to Dr. Arnold that he had had an ultrasound performed approximately two years prior that showed an enlarged liver; however, Dr. Arnold indicates in the notes that there is no evidence of an ultrasound in Plaintiff's chart.  (Id.).

that bloodwork was regularly obtained and analyzed for changes or progression of the disease, and that diagnostic scans were ordered when necessary.

Turning to the record evidence, the medical records reveal that Plaintiff has been enrolled in the chronic care clinic since at least 2009 and has maintained the lowest status level of care (Code 1), which is described as "generally healthy". (Doc. 67-2 at 59). Blood tests were obtained every six (6) months, since 2008, and the results of the lab work reveal that Plaintiff's condition was stable and/or remained within normal ranges. (See Doc. 24-1 at 74-75). According to Defendants, the bloodwork is drawn to monitor Plaintiff's platelet count and portal hypertension, the results of which are recorded on Plaintiff's Hepatitis C Flow-sheet. (Id.). Defendants aver that the normal platelet count range is between 144,000 and 400,000, with a platelet count below 30,000 being considered a dangerous level. Defendants also monitor Plaintiff's APRI, which is a calculation of AST to platelet ratio index.[10] Defendants contend this index is among the best validated methods for predicting HCV progression, and that Plaintiff's last test result of 0.3 is considered normal.[11] (Doc. 24-1 at 74-75). Lastly, Defendants point to the results of liver function studies, ALT, and aver that a normal ALT score is less than 41. (Doc. 67-5 at 30). Plaintiff has received the following measurements since September 2008:

---

[10]     According to healthline, the asparate aminotransferase (AST) to platelet ratio index, or APRI, is a noninvasive test alternative to liver biopsies and radiological imaging, in determining signs of damage or disease of the liver in persons with hepatitis C. Alex Snyder, *APRI SCORE*, HEALTHLINE, https://www.healthline.com/health/hepatitis-c/apri-score (last visited Feb. 11, 2020). The test was developed in 2003, and measures fibrosis, or scarring, which can lead to cirrhosis of the liver, a life-threatening condition that causes the liver to stop functioning. Id.

[11]     An internet search revealed that an APRI greater than 0.5 likely indicates some liver damage, with a number greater than 1.5 indicating ("very likely") cirrhosis. AST to Platelet Ration Index (APRI), HEPCBC, http://hepcbc.ca/tests/non-invasive-tests/apri/ (last visited Feb. 11, 2020).

| Date | Platelet Count | APRI | ALT |
|------|----------------|------|-----|
| 9/8/08 | 166,000 | 0.3 | 30 |
| 2/2/09 | 164,000 | 0.5 | 40 |
| 8/10/09 | 190,000 | 0.3 | 30 |
| 2/2/10 | 189,000 | 0.3 | 36 |
| 8/13/10 | 119,000 | 0.5 | 29 |
| 2/1/11 | 190,000 | 0.5 | 48 |
| 7/25/11 | 185,000 | 0.4 | 29 |
| 1/10/12 | 170,000 | 0.5 | 39 |
| 8/20/12 | 187,000 | 0.3 | 31 |
| 1/7/13 | 208,000 | 0.3 | 29 |
| 6/11/13 | 182,000 | 0.3 | 30 |
| 12/20/13 | 175,000 | 0.4 | 34 |
| 5/30/14 | 183,000 | 0.3 | 33 |
| 10/24/14 | 177,000 | 0.4 | 33 |
| 3/27/15 | 189,000 | 0.3 | 33 |
| 8/20/15 | 161,000 | 0.5 | 39 |
| 3/14/16 | 181,000 | 0.4 | 42 |
| 8/18/16 | refused labs | | |
| 9/30/16 | 153,000 | 0.4 | 28 |
| 3/10/17 | 229,000 | 0.3 | 33 |
| 8/11/17 | 171,000 | 0.3 | 31 |

(Doc. 24-1 at 74-75). In addition, the abdominal ultrasound conducted on December 15, 2016, suggested some "fatty change" to the liver but confirmed the liver was "normal" size and failed to indicate any necessary treatment.   (Doc. 67-5 at 220).  Accordingly, Defendants contend that there were no signs of cirrhosis or portal hypertension during the time for which Plaintiff complains and that Plaintiff's diagnostic numbers indicate no medical issues whatsoever with his Hepatitis C condition. (Doc. 67-1 at 3).  Defendants further declare that should Plaintiff's readings indicate Hep C treatment is necessary, then his medical status would be reevaluated.  (Doc. 67-5 at 30).

Consequently, the record evidences that Plaintiff's Hepatitis C condition has been monitored regularly, and his claim centers mainly on the refusal of Defendants to provide him with the specific medication, Harvoni, which he desires. Courts have consistently found that differences of opinion between an inmate and the prison medical staff over the specific medication to be provided does not constitute cruel and unusual punishment.[12] See Estelle, 429 U.S. 97 at 106; Trotter v. Correctional Medical Services, Inc., 2008 WL 2225696 at *9 (S.D. Ala. May 29, 2008) ("It is well-established that a difference in opinion or a disagreement between an inmate and prison officials as to what medical care is appropriate for his particular condition does not state a claim for deliberate indifference to medical needs."); Ramos v. Lamm, 639 F.2d 559, 575 (10th Cir. 1980) (noting that a difference of opinion between inmate and prison medical staff regarding treatment or diagnosis does not itself state a constitutional violation), *cert. denied*, 450 U.S. 1041, 101

---

[12]     The record evidences that the doctor looked into Plaintiff's inquiry regarding the new Hepatitis C medication, Harvoni, and determined that Plaintiff did not qualify for the medication.  (Doc. 67-5 at 110).  Dr. Arnold further discussed Plaintiff's eligibility (or lack thereof) for Hepatitis C treatment in general because he had no jaundice or evidence of cirrhosis based on the current bloodwork results.  (Doc. 24-1 at 67).

S. Ct. 1759, 68 L. Ed. 2d 239 (1981); Monteleone v. Corizon, 686 F. App'x 655, 659-661 (11th Cir. 2017) (finding that, where plaintiff received medical attention, plaintiff's claim that new medication was ineffective did not rise to the level of deliberate indifference); Phillips v. Jaspar Cty. Jail, 437 F.3d 791, 795 (8th Cir. 2006) (noting that a mere disagreement as to the proper drug cannot serve as the basis for a claim of deliberate indifference).

The issue presented by Plaintiff is not new to review in the Eleventh Circuit. In Black v. Ala. Dep't of Corrections, the plaintiff prisoner claimed deliberate indifference where he was denied antiviral drug treatment for Hepatitis C based on the department's policy. 578 F. App'x 794 (11th Cir. 2014). The Eleventh Circuit affirmed the district court's grant of summary judgment to the defendants, explaining:

> In Black's case, however, it is also undisputed that Black received regular care and close monitoring of his Hepatitis C. The Alabama DOC policy, adopted from the Federal Bureau of Prisons, sets forth criteria inmates must satisfy for placement in its Hepatitis C Treatment Program, in which inmates are considered for antiviral drug treatment. The policy prioritizes referral of inmates for antiviral drug treatment based on lab results. The medical staff at Limestone's Chronic Care Clinic routinely monitored Black's lab results to determine if he was a candidate for the program. Black's periodic liver function and liver enzyme test results were in the normal range and indicated that his condition was stable. Black's stable condition made him ineligible for placement in the Hepatitis C Treatment Program. Meanwhile, Limestone's medical staff continued to monitor Black and treated his symptoms . . . .
>
> Throughout, Black received regular care and monitoring for his Hepatitis C and medication for his symptoms, such as Lactulose to manage his blood ammonia levels. Black's condition remained stable, and he never had medical issues requiring immediate admission to the Hepatitis C Treatment Program. Moreover Black did not suffer any negative health consequences from not being in the Hepatitis C Treatment Program.
>
> Contrary to Black's claims, this is not a case of denied or delayed treatment. Rather, the record establishes that Black received treatment for his Hepatitis C. Moreover, given the undisputed facts, no reasonable jury could

conclude that the defendants, in treating Black, knowingly disregarded a serious risk of harm to him or that the treatment given amounted to more than gross negligence.

Id. at 795-96.

In the current action, Plaintiff has failed to prove that any of the Defendants provided objectively insufficient care in response to his Hepatitis C condition.  It is the job of the prison physician, based on his or her medical judgment, to decide whether or not antiviral medication is needed or what treatment to order.  Based on Defendants' knowledge and experience, they determined Plaintiff's course of treatment.  Whether the medical defendants "should have employed additional diagnostic techniques or forms of treatment is a classic example of a matter for medical judgment and therefore not an appropriate basis for liability under the Eighth Amendment."  Adams v. Poag, 61 F. 3d 1537, 1545 (11th Cir. 1995).  Accordingly, with no suggestion that Plaintiff's condition has worsened or that his bloodwork measurements fall out of the normal range of readings, no reasonable jury could conclude that the defendants, in treating Plaintiff, knowingly disregarded a serious risk of harm to him or that the treatment given amounted to more than gross negligence.  Bingham v. Thomas, 654 F.3d 1171, 1176 (11th Cir. 2011) (To establish an Eighth Amendment violation, a plaintiff must show he has a serious medical need and that defendant's response was "poor enough to constitute an unnecessary and wanton infliction of pain or risk of serious damage to future health.").  Thus, it is recommended that summary judgment be **GRANTED** in favor of all Defendants as to Plaintiff's claim regarding treatment for his Hepatitis C.

**2**.  **Claims related to Plaintiff's gallbladder issues.**

Plaintiff alleged in his complaint that he experienced and complained of pain in the right upper quadrant of his abdomen, for approximately a year and a half, before being informed that his gallbladder was infected, enlarged and would necessitate surgical removal. (Doc. 1 at 11). Plaintiff further alleged that Defendants have failed to remove his gallbladder. Since the filing of this action on January 11, 2017, it is undisputed that Plaintiff's gallbladder was surgically removed on or about March 24, 2017, and he no longer suffers from related symptoms, nor does he allege any medical complaints relating to his gallbladder.  (Docs. 67-1 at 2, 67-2 at 1-16, 35-36).  Accordingly, his claim for denial of medical care related to his gallbladder is moot.

As to any potential claim of delay in medical treatment, the undersigned finds that Plaintiff has failed to establish a constitutional claim.  While "[d]elay in access to medical attention can violate the Eighth Amendment ... when it is tantamount to unnecessary and wanton infliction of pain", Hill, 40 F.3d at 1187 (internal citations and quotations omitted), Plaintiff "must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment to succeed.... Consequently, delay in medical treatment must be interpreted in the context of the seriousness of the medical need, deciding whether the delay worsened the medical condition, and considering the reason for delay." Id. at 1188-89 (internal citations and footnotes omitted); see also Mann v. Taser Int'l, Inc., 588 F.3d 1291, 1307 (11th Cir. 2009). Mere allegations of negligence or malpractice do not amount to deliberate indifference. Campbell v. Sikes, 169 F.3d 1353, 1363-72 (11th Cir. 1999) (explaining that medical malpractice cannot form the basis for Eighth Amendment liability).

The record reveals that Plaintiff first complained of abdominal pain on April 22, 2015, and alluded that the pain was associated with his Hepatitis C condition; he was evaluated by the nursing staff on April 23, 2015. (Doc. 67-2 at 66). The nurse's note shows that Plaintiff's stated, "I want to be treated for Hep. C.  There is a new pill!", and his chief complaint was nausea and vomiting. (Doc. 24-1 at 261, 264). The nurse's examination revealed that Plaintiff suffered from nausea and vomiting for 2 days; he appeared to be in no acute distress; and his abdomen was not distended or bulging but was tender.  (Id. at 264). The evaluating nurse indicated that no urgent intervention was required, and Plaintiff was instructed to follow up with the doctor at his next appointment, which was scheduled for April 28, 2015. [13] (Id. at 262, 263, 265). On April 28, 2015, Plaintiff complained of nausea but did not complain of abdominal pain/swelling, diarrhea, or rashes/lesions. (Doc. 24-1 at 91). When seen in the chronic care clinic on July 2, 2015, October 16, 2015, and January 15, 2016,[14] Plaintiff did not voice complaints of ankle edema, nausea/vomiting, abdominal pain/swelling, diarrhea, or rashes/lesions.  (Doc. 24-1 at 86, 88). Plaintiff's April 2016 chronic care appointment was rescheduled for May 2016; however, Plaintiff refused this appointment, so it was rescheduled for August 2016, but rescheduled until September 2016 because there was no physician available.  (Docs. 24-1 at 81-83).  Consequently, Plaintiff's chronic care records belie that Defendants were subjectively aware that Plaintiff was suffering from abdominal pain and swelling or in need

---

[13]     At that time, Plaintiff appears to have had recurring prescriptions of Ibuprofen, 400 mg, twice a day, for pain from April 16, 2015 through April 29, 2015.  (Doc. 24-1 at 284).

[14]     On January 15, 2016, at the chronic care appointment, Plaintiff did complain of diarrhea, but it was associated with the antibiotics he was prescribed as discussed, *infra*, at note 15.

of medical treatment prior to September 2016. [15]  (Doc. 24-1 at 80).  Indeed, the record

supports that following Plaintiff's initial sick call request in April 2015 for abdominal pain,

Plaintiff did not submit another sick call request complaining of these symptoms until over

a year later, in September 2016.

On September 8, 2016, Plaintiff submitted a sick call request complaining of

abdominal pain, including stomach cramps, nausea, and body swelling, and he requested

a biopsy of his liver and a specialist opinion.  (Doc. 1 at 19).  Plaintiff reiterated the same

complaints and the request for Harvoni, a liver biopsy, and second opinion through a sick

call request on September 12, 2016.  (Doc. 24-1 at 35).  Plaintiff was evaluated by the

nursing staff and referred to the physician on September 13, 2016, to speak with the

doctor regarding his complaints at the next chronic care clinic.  (Doc. 24-1 at 34).

On September 13, 2016, Plaintiff was evaluated and complained that he "want[ed]

to be treated for Hep C," and he reported having nausea and abdominal pain (which he

---

[15]     While Plaintiff did submit medical complaints and/or grievances during this time
(including, June 2 and July 22, 2015, and July 31, 2016), he did not seek medical
treatment for abdominal complaints. Plaintiff was evaluated on June 9, 2015 by the
nursing staff and denied any abdominal pain.  (Doc. 67-3 at 95).  When examined on
August 5, 2015, for an unrelated complaint, Plaintiff made no mention of abdominal pain
or discomfort.  (Doc. 67-3 at 92-94). Plaintiff was seen in the health care unit multiple
times in January 2016 for complaints of diarrhea.  Plaintiff, however, attributed the onset
of diarrhea to his recent prescription and administration of antibiotics. Plaintiff was
evaluated on January 6, 20, 26, and 29, 2016 for his complaints of diarrhea and pain in
his upper abdomen, and he was provided Pepto Bismol to alleviate his symptoms.  (Doc.
67-3 at 83-91).  Plaintiff was also examined by the doctor for his symptoms on February
3, 2016, and the record indicates that his symptoms resolved by February 8, 2016.  (Doc.
67-3 at 111). Notably, Plaintiff refused his appointment with the doctor on May 31, 2016
and refused labwork on August 9 and 18, 2016.  (Doc. 24-1 at 241-242). Plaintiff was next
evaluated by the nursing staff on August 30, 2016, for an unrelated skin complaint, and
again did not mention suffering from abdominal pain at that time.  (Doc. 67-3 at 80).

rated a 2 on a scale of 1 to 10, with it being a 4 at worst, and described the pain as cramping and intermittent).  (Doc. 24-1 at 33).

On September 19, 2016, Dr. Arnold examined Plaintiff for complaints of upper right abdominal pain.  (Doc. 24-1 at 78).  While the medical records are practically illegible, the notes reflect that Dr. Arnold was concerned with and assessed issues regarding Plaintiff's gallbladder.  (Id.).  Plaintiff was again examined by Dr. Arnold in the chronic care clinic on September 26, 2016, where Plaintiff complained of weight gain, ankle edema, nausea, and abdominal swelling.  (Doc. 24-1 at 80).  Dr. Arnold reviewed Plaintiff's lab reports with Plaintiff, indicated changes to Plaintiff's treatment plan, ordered blood pressure monitoring for the next two weeks, and indicated that Plaintiff's obesity hindered a thorough abdominal exam.  (Id.).

On November 30, 2016, Dr. Arnold examined Plaintiff, assessing his complaints of upper right quadrant pain and weight gain and prescribed a diuretic for the swelling and submitted a request for an abdominal ultrasound. (Doc. 67-2 at 21-22; Doc. 24-1 at 15). The ultrasound was approved by Dr. Hood on December 8, 2016.  (Doc. 67-2 at 21-22).

On December 15, 2016, the ultrasound was performed and revealed no gallstones but showed a thickened wall of the gallbladder (suggesting inflammation).  (Doc. 67-5 at 220).  The ultrasound also showed an echogenic liver (suggesting a fatty change or other diffuse hepatic disease) but evidenced the liver size was normal, and no other abnormalities were seen.  (Id.).  Upon obtaining the results of the ultrasound, Dr. Arnold immediately submitted a request for a consult with Dr. Paul for an evaluation for a possible cholecystectomy (gallbladder removal).  (Doc. 67-2 at 19).  The request was approved by Dr. Hood on December 19, 2016, and an appointment was scheduled, off-site, with Dr.

Paul, for February 14, 2017.  (Id.).  On February 21, 2017, another request was submitted and approved for a laparoscopic cholecystectomy, an esophagogastroduodenoscopy (EGD), and a colonoscopy.  (Doc. 67-2 at 16).  These procedures were approved by Dr. Hood on February 22, 2017, and Plaintiff was scheduled an off-site appointment with Dr. Paul for March 24, 2017.  (Doc. 67-2 at 16).

Plaintiff underwent laparoscopic removal of his gallbladder on March 24, 2017, and the record further indicates that a liver biopsy, EGD, and colonoscopy were conducted with insignificant results or findings.  (Doc. 67-2 at 4).

Accordingly, the record supports that Plaintiff's sick call requests related to abdominal pain namely began in September 2016, by November 2016 Plaintiff was scheduled for an ultrasound, and by December 2016 Plaintiff was scheduled to see a specialist.  Thus, the record supports that his complaints were promptly and consistently responded to, resulting in evaluations of his complaints and referrals to the physicians.  It cannot be said that Plaintiff's complaints were ignored or treated with deliberate indifference.  (Even his medical grievances received prompt responses).  While Plaintiff alleges that Defendants' failure to promptly act or treat his symptoms caused him to need surgery to remove his gallbladder, the record does not support Plaintiff's claim that Defendants acted with deliberate indifference to his abdominal pain. At most, Defendants' actions represent negligence in not obtaining diagnostic testing earlier as Plaintiff alleges in his complaint.  This, however, falls far short of a constitutional violation.

The mere fact that Plaintiff may disagree with the efficacy of the treatment, simply prefer a different course of treatment, or prefer a different medical practitioner does not state a valid claim of medical mistreatment under the Eighth Amendment.  See Adams v.

Poag, 61 F.3d 1537, 1545 (11th Cir. 1995) (whether defendants "should have employed additional diagnostic techniques or forms of treatment 'is a classic example of a matter for medical judgment' and therefore not an appropriate basis for grounding" constitutional liability); Harris v. Thigpen, 941 F.2d 1495, 1505 (11th Cir. 1991) (explaining that a difference in medical opinion between the prison's medical staff and the inmate about the inmate's course of treatment will not support a claim of cruel and unusual punishment). "When a prison inmate has received medical care, courts hesitate to find an Eighth Amendment violation." Waldrop, 871 F.2d at 1035. In this action, Plaintiff fails to show that the medical treatment he received was so grossly inadequate "as to amount to no care at all." McElligott v. Foley, 182 F.3d 1248, 1257 (11th Cir. 1999) ("A core principle of Eighth Amendment jurisprudence in the area of medical care is that prison officials with knowledge of the need for care may not, by failing to provide care, delaying care, or providing grossly inadequate care, cause a prisoner to needlessly suffer the pain resulting from his or her illness."); Whitley v. Albers, 475 U.S. 312, 319, 106 S. Ct. 1078, 89 L. Ed. 2d 251 (1986) ("It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishment Clause.").

Additionally, Plaintiff has placed no verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment to establish that any delay in treating his abdominal pain caused the surgical intervention. Mann v. Taser Int'l, Inc., 588 F.3d 1291, 1307 (11th Cir. 2009). No doubt, Plaintiff asserted his need and desire for medical treatment for his abdominal pain, but it cannot be said that Plaintiff has been denied treatment or that any unreasonable delay ensued. The record before the Court reflects that Plaintiff received medical evaluations after his submitted sick call requests

(and most often was referred to a physician thereafter).  (Doc. 24-1 at 35, 36).  Moreover, the record is replete with medical examinations and treatment for complaints beyond HCV and abdominal pain, including skin issues, dental issues, vision issues, diarrhea, common colds, ganglion cysts, and Plaintiff has at all times received treatment in the form of referrals to specialists, scans, surgeries, medications, and profile changes (namely a therapeutic diet change for weight loss).  Plaintiff does not allege, and the record does not reflect, that his condition worsened over the months he waited for surgery.  Shapley v. Nevada Bd. of State Prison Comm'rs., 766 F.2d 404, 407 (9th Cir. 1985) (noting that where there is a "'mere delay in surgery,' a prisoner can make 'no claim for deliberate medical indifference unless the denial was harmful.'") (citation omitted).  And, Plaintiff fails to show how Defendants are responsible for any delay, as the record indicates that expedient consult requests were submitted, Corizon, through Dr. Hood, responded in a timely manner by approving every consult request, and Plaintiff was transported to every scheduled appointment.  Additionally, there appears to have been no emergency need for treatment.  Notably, even after Plaintiff was evaluated by the specialist Dr. Paul, and the need for surgical removal of Plaintiff's gallbladder was confirmed, Dr. Paul did not recommend immediate or emergent treatment; rather, his office scheduled the surgery over a month later.

Accordingly, Plaintiff has failed to produce supporting evidence that any "delays" in the receipt of medical treatment worsened his conditions or were caused by nonmedical reasons.  As such, Plaintiff may not proceed on his medical deliberate indifference claim, and Defendants are entitled to summary judgment on the deliberate indifference claim.

### 3.    Claims related to Defendants McCants and Johnson.

Plaintiff has named Defendants Kimberly McCants and Cindy Johnson in his suit. Plaintiff alleges McCants and Johnson have been deliberately indifferent to his medical needs, by failing to answer his questions and concerns regarding obtaining HCV treatment, namely the eligibility requirements for receipt of HCV treatment.  (Doc. 1 at 12).  Plaintiff further alleges Defendants' actions are part of Corizon's policy to delay medical treatment to inmates, in order to save money and increase the corporation's profits.  (Id.).

Review of the record, however, reveals that Defendants McCants and Johnson promptly responded to every grievance and/or medical complaint filed by Plaintiff. Defendants informed Plaintiff that the doctor (along with the disease specialist Dr. Joiner) makes all of the medical decisions at Holman and that Plaintiff could discuss the matter with the doctor; Defendants further informed Plaintiff of his scheduled appointment dates. (Doc. 1 at 18, 21).   Defendants also advised Plaintiff that his condition was being monitored by regular bloodwork and through the chronic care clinic.  (Doc. 1 at 16).   The record belies Plaintiff's claim that Defendants McCants and Johnson failed to respond to his complaints or answer his questions regarding HCV treatment.

Moreover, Defendants have affirmed they are not responsible for providing daily medical care to inmates and have no knowledge of ever providing medical care to Plaintiff. (Docs. 67-3; 67-4).  To the extent Plaintiff claims these individuals are responsible as supervisory officials for the denial and/or delay of medical treatment, such a claim is rooted in the theory of *respondeat superior* and is not cognizable in a § 1983 action. Edwards v. Ala. Dep't of Corrs., 81 F. Supp. 2d 1242, 1255 (M.D. Ala. 2000) ("A theory

of *respondeat superior* is not sufficient to support [a] § 1983 claim. . . ."); see also Duff v. Steub, 378 F. App'x 868 (11th Cir. 2010) ("Deliberate indifference can be based on the defendant's personal participation in the allegedly unconstitutional conduct or on the defendant's actions as a supervisor.").  To establish a claim of supervisory liability under § 1983, Plaintiff must show that the supervisor personally participated in the alleged unconstitutional conduct or show a causal connection between the actions of the supervising official and the alleged constitutional deprivation.  Cottone v. Jenne, 326 F.3d 1352, 1360 (11th Cir. 2003).

Defendant Kimberly McCants, the Corizon Health Services Administrator at Holman Correctional Facility, avers that she is not an RN or LPN and does not provide nursing care to inmates at Holman and at no time did she provide nursing care to Plaintiff or deny or delay him care.  (Doc. 24-2).  Defendant Cindy Johnson avers that she, as the RN Regional Coordinator, has not provided "hands on care" to Plaintiff.  (Doc. 24-3).  Defendants aver that it is the decision of the physicians and disease specialist Dr. Joiner as to when an inmate patient qualifies for Hepatitis C treatment.  Further, Plaintiff has not pointed to any facts connecting Defendants McCants or Johnson to an unconstitutional policy or custom regarding the administration or protocol in HCV treatment or in denying or delaying medical care.  Given that Plaintiff fails to personally link actions of Defendants McCants and Johnson to a claim, the undersigned finds that Plaintiff has failed to establish a valid Eighth Amendment claim against Defendants McCants and Johnson and summary judgment should be granted in their favor.

### IV.     Conclusion.

Based on the foregoing, it is **RECOMMENDED** that Defendants' Motion for Summary Judgment be **GRANTED,** and that Plaintiff's action against Defendants be **DISMISSED with prejudice**.

The instructions that follow the undersigned's signature contain important information regarding objections to the report and recommendation of the Magistrate Judge.

### <u>NOTICE OF RIGHT TO FILE OBJECTIONS</u>

A copy of this report and recommendation shall be served on all parties in the manner provided by law. Any party who objects to this recommendation or anything in it must, within fourteen (14) days of the date of service of this document, file specific written objections with the Clerk of this Court.  <u>See</u> 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); S.D. ALA. L.R. 72(c).  The parties should note that under Eleventh Circuit Rule 3-1, "[a] party failing to object to a magistrate judge's findings or recommendations contained in a report and recommendation in accordance with the provisions of 28 U.S.C. § 636(b)(1) waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions if the party was informed of the time period for objecting and the consequences on appeal for failing to object. In the absence of a proper objection, however, the court may review on appeal for plain error if necessary in the interests of justice."  11th Cir. R. 3-1.  In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the Magistrate Judge's report and recommendation where the

disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the Magistrate Judge is not specific.

**DONE** this **4th** day of **March, 2020.**

<u>s/P. BRADLEY MURRAY</u>
UNITED STATES MAGISTRATE JUDGE